**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 20-CR-703 (JMV) |
| v. | Filed Electronically |
| MICHAEL HEALY | **Motion to declare the defendant's capital prosecution unconstitutional** |
| Defendant. | |

---

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DECLARE HIS CAPITAL PROSECUTION UNCONSTITUTIONAL**

---

Thomas Ambrosio, Esq.
750 Valley Brook Avenue
Lyndhurst, NJ 07071
201.935.3005

Stephen Turano, Esq.
60 Park Place
Newark, NJ 07102
917.974.1781

*Attorneys for Defendant Michael Healy*

Dated: February 24, 2021

**Preliminary Statement**

Defendant Michael Healy (Healy), faces the potential of the death penalty on any one of three murders charged in the superseding indictment. He seeks an order from the Court permanently barring the Government from seeking the death penalty for these murders because willful government action in handling the coronavirus pandemic has permanently undermined his ability to conduct adequate mitigation investigation pursuant to 18 USC § 3592 and has permanently denied him the right to have a fair death penalty trial, in violation of the Fifth, Sixth, and Eighth Amendments.

Fifth Amendment

*No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.*

Sixth Amendment

*In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.*

Eighth Amendment

*Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.*

Remedy of Limited Scope

This motion does not seek to have the death penalty declared unconstitutional, but rather to have Healy's capital prosecution declared unconstitutional because it occurred during the coronavirus pandemic, a time period in which the health, social, economic and political aspects of society have been profoundly altered on a daily basis. While progress has been made in combatting the pandemic, such as invention of a variety of vaccines, no one can determine when we will return to life without the need for social distancing. Therefore, any argument that the irreparable harm suffered by Healy can be prevented by simply giving him more time to conduct adequate death penalty mitigation investigation is not valid.  The focal point of this motion is

1

that willful government action in response to the coronavirus pandemic has permanently impaired Healy's ability to conduct proper death penalty mitigation investigation.

The unique and unprecedented circumstances created by the government's willful disregard in addressing the coronavirus pandemic makes this a case of first impression.

### Statement of Facts and Procedural History

Healy, along with four co-defendants, was charged in a Superseding Indictment filed June 5, 2019 (D.E. 26). He is charged with three separate murders in aid of racketeering, as well as drug conspiracy. Healy's four co-defendants had a January 20, 2021 deadline to provide the United States Attorney for the District of New Jersey with mitigation submissions pursuant to pursuant to Section 9-10.000, et seq., of the United States Attorneys Manual. Healy's deadline to provide his mitigation submission was extended by the Government to March 30, 2021.

On or about November 15, 2019 Healy's defense team received the Government's initial Rule 16 discovery, comprised of 614 GB of PDF, audio and video files. The Court has not yet set a pretrial motion scheduling order or a trial date.

### Legal Argument

**The government should be permanently barred from seeking the death penalty for the murders in the superseding indictment because the government willfully disregarded expert and scientific advice on how to properly combat the coronavirus pandemic, thereby permanently preventing the defendant from being able to conduct adequate and proper death penalty mitigation investigation**.

### Summary of Argument

1. The death penalty can only be given to a defendant if twelve death-qualified jurors unanimously vote for death. [1]

2. One juror has the ability to reject a death sentence and vote to spare a defendant's life.

3. All mitigation evidence has the potential of persuading a juror to reject the death penalty.

4. It is impossible to identify what specific mitigation evidence may persuade a juror to reject the death penalty since juror deliberations are conducted in secret.

---

[1] 18 USC § 3593(b)(3) allows the court alone, upon the motion of the defendant and with the approval of the attorney for the government to determine if the death penalty is appropriate. Healy does not intend to make that motion.

5. The coronavirus pandemic has made it impossible to conduct mitigation investigation in accordance with ABA Guidelines established for capital prosecutions, thereby depriving the defendant from presenting potentially lifesaving mitigation evidence to the jury.

6. The loss of lifesaving mitigation evidence will cause the defendant irreparable harm if his death penalty prosecution is allowed to continue.

7. The Government, under the direction of President Trump, ignored the advice of medical and scientific experts on how to combat the coronavirus pandemic.

8. Government action prolonged and worsened the coronavirus pandemic, leading to more than 28 million Americans contracting the coronavirus virus and to the death of more than 500,000 and counting.[2]

9. As a direct result of government action, the continued capital prosecution of the defendant would deprive him the right of due process of law, effective assistance of counsel and subject him to cruel and unusual punishment.

The arguments set forth above lead to the conclusion that the defendant's Fifth Amendment right to due process, Sixth Amendment right to effective assistance of counsel and Eighth Amendment right to be free from cruel and unusual punishment will be violated unless the government is permanently barred from seeking the death penalty against him for the murders charged in the superseding indictment.

### Government action worsened and prolonged the coronavirus pandemic.

The country has been in the midst of the unprecedented, world-wide coronavirus pandemic, caused by the COVID-19 virus, which continues to mutate into new and more deadly variants. This Court, like federal judges throughout the country, has undoubtedly ruled on compassionate release motions detailing both the effects of the coronavirus pandemic and the government's purposeful disregard of the advice of its own experts on how to combat it. The coronavirus pandemic has had dire effects on every facet of life in the United States. The Court System and its ability to render justice has not been spared from the disruptive consequences of the coronavirus. More importantly, in the United States, the disruptive consequences of the coronavirus pandemic were made worse and prolonged as a direct result of the Trump administration's policies and actions in response to the coronavirus. The Trump administration policies in handling the coronavirus pandemic amounts to willful government action which will cause permanent harm to the defendant unless his capital prosecution is permanently barred.

Since March of 2020, there has been extensive, round-the-clock media coverage of the coronavirus pandemic documenting the Trump administration's gross mishandling of the coronavirus pandemic. As far back as January of 2020 the government has acted in bad faith by

---

[2] As of the date this motion was filed. The death and infection from COVID-19 will continue to grow.

aggressively ignoring expert and scientific advice about how to properly combat and control the coronavirus. President Trump, in direct contradiction of advice from government experts, publicly denounced the wearing of masks to control the spread of the coronavirus and regularly attended public rallies without a mask. His actions directly influenced millions of Americans to ignore coronavirus safety protocols recommended by the government's leading medical experts. Tens of millions of Americans, following the coronavirus health and safety protocol example set by President Trump, to this day, refuse to wear masks and or to take other precautions to prevent the spread of the coronavirus.

Astoundingly, President Trump admitted to Bob Woodward in an extensive interview, that he was aware of the seriousness of the virus early on, but downplayed it because of his purported concern about mass panic.[3] If this Court is not convinced by the wide coverage of the government's gross mishandling of the coronavirus, we respectfully request a full hearing to marshal in further evidence and expert testimony in order to establish this point.

The following articles, comprise a tiny portion of the thousands of news reports which document the government's purposeful mishandling of the coronavirus pandemic.[4]

*Trump Disinfectant Remarks Echo Claims by Miracle-Cure Quacks,* NY Times, April 27, 2020 ("President Trump's public statements about using disinfectants to potentially treat the coronavirus have put him in the company of pseudoscientists and purveyors of phony elixirs who promote and sell industrial bleach as a "miracle cure" for autism, malaria and a long list of medical conditions")

*The biggest errors the Trump administration made in response to COVID*, Fortune, November 13, 2020

*One Year, 400,000 Coronavirus Deaths: How the U.S. Guaranteed Its Own Failure*, NY Times, January 18, 2021;

*Fauci on What Working for Trump Was Really Like*, NY Times, January 24, 2021;

*COVID-19: US federal accountability for entry, spread, and inequities—lessons for the future,* European Journal of Epidemiology (2020) 35:995–1006

*GAO report slams Trump administration response to the coronavirus pandemic,* Washington Post, February 3, 2021

The above excerpts are sufficient proof that the government purposefully mishandled the coronavirus pandemic. If the Court is not willing to accept those facts as sufficient proof, then

---

[3] See https://www.theguardian.com/media/2020/sep/19/bob-woodward-donald-trump-rage-interview
[4] See articles attached as "Exhibit 1"

the defendant would request to have a hearing in order to be able prove that the government mishandled the coronavirus pandemic, since that fact is crucial to the viability of this motion.

## **Death is Different**

The United States Supreme Court has long recognized that the qualitative difference in the severity of the punishment in a capital case creates a greater need for reliability in the determination that death is the appropriate punishment in a specific case. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *see, also, Gregg v. Georgia*, 428 U.S. 153 (1976); *Ford v. Wainwright*, 477 U.S. 399 (1986); *Harmelin v. Michigan*, 501 U.S. 957 (1991); *Monge v. California*, 524 U.S. 721 (1998); *see, also*, *Gilmore v. Taylor*, 508 U.S. 333, 342, 113 S. Ct. 2112, 2117 (1993) ("the Eighth Amendment requires a greater degree of accuracy and fact finding than would be true in a noncapital case."); *United States v. Watson*, No. 05-80025, 2007 U.S. Dist. LEXIS 94736, at 6 (E.D. Mich. Dec. 28, 2007) ("Two fundamental, constitutional principles underlie death penalty jurisprudence. The first principle requires courts to assure heightened reliability in capital sentencing because capital punishment is qualitatively different from other punishments").[1] The penalty of death is "unique in both its severity and finality." *Gardner v. Florida*, 430 U.S. 349, 357 (1977).

As this is a capital murder case, it is extraordinarily complex and time-consuming. The ABA has stated:

> [D]eath penalty litigation is extraordinarily complex, both for the courts and for the attorneys involved. Not only do the cases incorporate the evidentiary and procedural issues that are associated with virtually every noncapital case, but they also involve a host of issues that are unique to capital cases. These include: special *voir dire* of jurors; presentation of evidence going to guilt or innocence and punishment; special penalty procedures, including additional factual findings by the jury...
>
> * * *
>
> It is well established that representation of an individual in a capital case is an extraordinary responsibility placed on any lawyer.... Counsel must not only be able to deal with the most serious crime - homicide - in the most difficult circumstances, but must also be thoroughly knowledgeable about a complex body of constitutional law and unusual procedures that do not apply in other criminal cases.

American Bar Association, *Toward A More Just And Effective System of Review in State Death Penalty Cases*, at 43, 49, 50 (Oct. 1989).

The requirement of heightened reliability dictates that courts provide capital defendants with special accommodations, considerations, and "protections that the Constitution nowhere else provides." *Harmelin*, 501 U.S. 957, 994. The fundamental truth that "death is different" is a "bedrock principle" of our criminal jurisprudence which "is always a consideration in the handling of death [penalty] cases." *Bunion v. Quarterman*, 524 F.3d 664, 675 (5th Cir. 2008).

The issues raised in this pleading must of necessity be analyzed through a "death is different" lens. *See, e.g.*, *Sampson v. United States*, 832 F.3d 37, 43 (1st Cir. 2016) (noting that "an already significant legal question is even more so in the context of a capital case, because 'death is [] different.'"); *United States v. Lopez-Matias*, 522 F.3d 150, 158 (1st Cir. 2008) ("We do believe that when the stakes are so high, a smaller quantum of prejudice may justify a sanction").

For additional cases on this point, see, e.g., *United States v. Fell*, 360 F.3d 135, 143 (2d Cir. 2004) ("We fully agree with the district court that 'heightened reliability' is essential to the process of imposing a death sentence ... The finality of the death penalty requires a greater degree of reliability when it is imposed") (citations omitted); *Murray v. Giarratano*, 492 U.S. 1, 8-9 (1989) ("The finality of the death penalty requires a 'greater degree of reliability' when it is imposed"); *Monge v. California*, 524 U.S. 721, 732 (1998) ("Because the death penalty is unique in both its severity and its finality, we have recognized an acute need for reliability in capital sentencing proceedings"); *Underwood v. Royal*, 894 F.3d 1154, 1175-76 (10th Cir. 2018) ("we are mindful of the need for heightened reliability in determining a capital sentence").

### **Standard of Practice: The American Bar Association Guidelines**

The analysis of the constitutional implications of conducting a capital proceeding during the coronavirus pandemic must include the minimum practice standards outlined in the *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (2003) (hereinafter "ABA Guidelines") and the *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases* (hereinafter "Supplementary Guidelines"). Because "death is different", "so too are the lengths to which defense counsel must go in investigating a capital case." *Doe v. Ayers*, 782 F.3d 425, 435 (9th Cir. 2015) (citations omitted). Those "lengths" are largely set out in the ABA Guidelines, which "continue to stand as the single most authoritative summary of the prevailing professional norms in the realm of capital defense practice." Russell Stetler, W. Bradley Wendel, *The ABA Guidelines and the Norms of Capital Defense Representation*, Hofstra Law Review, Volume 41:635 (2013).

"The Guidelines and Supplementary Guidelines have been cited favorably in nearly 400 state and federal capital appellate decisions, including the United States Supreme Court." *Declaration of Emily Olson-Gault, Esq*, American Bar Association Death Penalty Representation Project, [hereinafter "ABA Declaration"][8]   See also, *Padilla v. Kentucky*, 559 U.S. 356, 366-67 (2010) ("We long have recognized that '[p]revailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable ... '" (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)); *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam)); *Wiggins v. Smith*, 539 U.S. 510, 535-38 (2003); *Rompilla v. Beard*, 545 U.S. 374, 390-92 (2005).

The ABA Guidelines require "high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any jurisdiction." Guideline 1.1.  Among many other things, the ABA Guidelines recognize that "[e]very task ordinarily performed in the

---

[8] *Declaration of Emily Olson-Gault, Esq.* attached as "Exhibit 2"

representation of a criminal defendant is more difficult and time-consuming when the defendant is facing execution ... Due to the extraordinary and irrevocable nature of the penalty, at every stage of the proceedings counsel must make extraordinary efforts on behalf of the accused." Guideline 1.1, Commentary at 923. *See also*, Commentary to Guideline 9.1 (recognizing the "extraordinary responsibilities and commitment required of counsel in death penalty cases").

Since the early-March declaration that the coronavirus pandemic was a public health emergency defense counsel has been unable to meaningfully, substantively, and confidentially meet or communicate with Healy about his case. As of the filing of this motion he continues to be without effective Sixth Amendment counsel, in part, as a direct result of the government's mishandling of the coronavirus pandemic.

The coronavirus pandemic has substantially impaired counsel's ability to take on the "extraordinary responsibility" of effectively representing Healy while his life is at stake. More importantly, counsel's inability to effectively represent Healy was caused, in part, by government action in mishandling the coronavirus pandemic. The legal analysis regarding government action permanently preventing the defendant from being able to adequately defend himself in a capital prosecution must be a qualitive analysis, rather than a quantitative analysis. In other words, so long as government action in handling the coronavirus made it worse or prolonged it *to any degree* then the defendant's constitutional rights have been denied in the context of his capital prosecution.

## Right to Effective Representation

The Supreme Court has recognized that "the assistance of counsel is not limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." *Maine v. Moulton*, 474 U.S. 159, 170 (1985); *see also Powell v. Alabama*, 287 U.S. 45 (1932) (even an educated defendant "requires the guiding hand of counsel at every stage of the proceedings against him"); *Brewer v. Williams*, 430 U.S. 387, 398 (1977) (right to assistance of counsel is "vital need at pretrial stage").

The constitutional right to counsel is among the most sacred rights. As the Supreme Court instructs, it is "a fundamental component of our criminal justice system:"

Lawyers in criminal cases "are necessities, not luxuries." Their presence is essential because they are the means through which the other rights of the person on trial are secured. Without counsel, the right to a trial itself would be "of little avail," as this Court has recognized repeatedly. "Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have. *United States v. Cronic*, 466 U.S. 648, 653-54 (1984) (internal cites and footnotes omitted).

## The government's willful mishandling of the coronavirus pandemic irreparably harms Healy in the context of a capital prosecution

In light of the unique demands imposed by the "Death is Different" Jurisprudence and the ABA Guidelines and Supplementary Guidelines as explained above, there are a myriad of scenarios in which a defendant facing the death penalty would be irreparably harmed as a direct result of the government's purposeful mishandling of the coronavirus pandemic. The most obvious example is a mitigation witness who died from the coronavirus; in such a case, the jury would never get to hear evidence from that witness that might have convinced one juror to vote for life in prison, rather than for the death penalty. A second example is a mitigation witness who got "brain fog" from the coronavirus".[9] If a mitigation witness forgot even a small fact about the defendant, then that fact would never get to the jury; that forgotten fact could have been a fact that convinced one juror to vote for life in prison, rather than for the death penalty. A third example is a mitigation witness who refused to meet with the defense team because he/she was afraid the meeting(s) might have caused him/her to be infected with the coronavirus or possibly because the pandemic caused the witness not to go out of his/her way to speak compassionately on the behalf of a death penalty defendant at a time when he/she is mired in their own problems, exacerbated by the pandemic. Here, like in the situation of deceased mitigation witness, the jury would never get to hear evidence that could have convinced one juror to vote for life in prison, rather than for the death penalty.

These are merely some examples of how the government's purposeful mishandling of the coronavirus pandemic has caused irreparable harm to the defendant.

The Government might argue that the above examples are speculative and therefore, do not validly support the conclusion that Healy will suffer irreparable harm if his capital prosecution is allowed to continue. That argument has no weight because Healy is facing the death penalty. As discussed above, "death is different" and any legal analysis requires heightened scrutiny. If the Court applies heightened legal analysis to Healy's arguments then it should conclude that Healy's Fifth, Sixth, and Eighth Amendment rights will be violated unless the government is permanently barred from seeking the death penalty against him for the murders charged in the superseding indictment.

### More time to conduct mitigation investigation won't prevent irreparable harm

The Government might also argue that any difficulties in conducting constitutionally adequate mitigation investigation during the coronavirus pandemic can be remedied by extending the trial date far enough past the date the pandemic is declared over, in order to allow

---

[9] *See* https://braincheck.com/articles/covid-brain-fog/ Doctors and scientific researchers don't know exactly what causes cognitive impairment post-COVID. However, it's gaining more attention as a significant condition that can include memory loss, aphasia, dizziness, confusion, and other neuropsychological symptoms long after the immediate effects of the virus have gone. A recent 120-person study out of France found that 34% of patients hospitalized with COVID reported memory loss and 27% noticed problems concentrating months after being released. Recently, The New York Times profiled several people suffering at different levels with cognitive impairment due to post-COVID brain fog. All expressed cognitive limitations, issues with short- and long-term memory, and few signs of improvement months later. *See also,* https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html

the defense team to conduct constitutionally adequate investigation. That argument also has no validity because it does not account for evidence that may have been permanently lost, obscured, destroyed or altered during the coronavirus pandemic as a result of government action.

## All mitigation evidence is potentially lifesaving

One juror has the ability to reject a death sentence and save a defendant's life. *See* 18 USC § 3593(e). [T]he jury by unanimous vote...shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence. The corollary to this statute is that it only takes one juror out or twelve to save a defendant's life.

In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, ... See 18 USC § 3592(a)

Furthermore,

At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592...The defendant may present any information relevant to a mitigating factor...Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. See 18 USC § 3593(c)

Since a death qualified jury is required to consider any mitigating factor (note the use of the word "shall" in 18 USC § 3592(a)) and also **because the statute permits a defendant to present any information relevant to a mitigating factor, regardless of its admissibility under the rules governing admission of evidence at criminal trials,** it is axiomatic that all mitigation evidence has the potential to save a capital defendant's life. (emphasis added)

Utilizing the heightened legal analysis required for death penalty cases supports the argument that Healy should have no burden to prove what specific mitigation evidence he lost as a result of willful governmental action. Placing such a burden on a capital defendant would be grossly unfair. The major point of this motion is that Healy lost lifesaving evidence as a result of the government's mishandling of the coronavirus pandemic. Since jury deliberations are conducted in secret, no one other than the jurors will be privy to what evidence saved Healy's life. If follows then, Healy should have no burden to prove any specific fact was lost or destroyed as a result of government action in handling the coronavirus pandemic.

## Lost Evidence

The government action in making the coronavirus worse unfairly increases counsel's difficulty in meeting the demanding requirements for obtaining face-to-face mitigation evidence as required by ABA standards.  An examination of the "lost-evidence," line of cases, which generally have far less of a dramatic impact as the critical amassing of death penalty mitigation evidence, are illustrative.

In *Arizona v Youngblood*, 488 U.S. 51, 58 (1988), the Court held that "[u]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." However, that case only held that the dismissal of an indictment as a result of lost evidence is too drastic a remedy.   *Youngblood* has come under increased criticism:

Taken as a whole, those developments have so undermined *Youngblood*'s rationale and legitimacy that it no longer merits stare decisis effect. In place of the bad faith standard, a better, more balanced approach would take into account the overriding concern of due process: adjudicative fairness. Thus, a court would assess both government culpability and the materiality of the lost evidence or prejudice suffered by the accused. In this case the potentially lost evidence is lifesaving.

*Old Blood, Bad Blood & Youngblood: Due Process, Lost Evidence, & Limits to Bad Faith, Norman C. Bay,* Wash. Univ. Law Rev. vol. 86, issue 2 (2008)(noting that interpretation and application of <u>Youngblood</u> is in disarray).

In addition, it has been observed that, "potentially useful evidence" is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *United States v. Zaragoza-Moreira, 780 F.3d 971, 978 (9th Cir. 2015)*(destroyed checkpoint video was "potentially *exculpatory* evidence" because, "it could have been subjected to tests, the results of which might have exonerated the defendant" who claimed she was under duress to commit the drug crime prior to the automatic destruction of the videotape 30 to 45 days later).   The *Zaragoza-Moreira* court aptly noted that when "potentially useful evidence" has been destroyed by the government, the bad faith inquiry initially "turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Id*. at 979.

Here, Healy has shown that since the government has acted in bad faith, potentially lifesaving mitigating evidence may have been destroyed or at a minimum, has been made difficult to uncover. There is simply no way that defense counsel can now fulfill the demanding requirement of obtaining mitigation evidence in accordance with the ABA standards cited above.

### <u>Mitigation Investigation Specific to Healy</u>

Since mid-March 2020 the ongoing coronavirus pandemic has prevented Healy from being able to conduct mitigation investigation in accordance with the ABA Guidelines and Supplementary Guidelines on death penalty mitigation.[10] Attorneys defending a client on a death

---

[10] *See Vartkessian Declaration* attached as Exhibit 3

penalty case are required to turn over every stone. Proper mitigation in Healy's case requires the defense team to interview dozens of people in at least six different states and travel as far away as California. In accordance with accepted death penalty guidelines the defense team has elected to only conduct in-person interviews of witnesses who are wearing masks. The ongoing coronavirus pandemic continues to prevent the Healy defense team from, among other things, traveling by plane to interview witnesses and from being able to interview many local witnesses in accordance with ABA standards.

Apart from permanently hampering counsel's ability to obtain mitigation evidence, the pandemic continues to create a situation where counsel is unable to provide effective representation to capital clients based on a conflict between their personal interests in not being exposed or exposing others to the virus and their client's interest in a comprehensive, thorough, and timely investigation of their case. Counsel are laboring under an actual conflict of interest because they are "required to make a choice advancing [their] own interests to the detriment of [their] client's interests." *Stoia v. United States*, 22 F.3d 766, 771 (7th Cir. 1994) (internal citations omitted). This is yet another instance of Healy's Sixth Amendment rights being denied in connection with his capital prosecution.

Defense counsels' fears that their work will place them or their families at risk of contracting the virus are widely held, and quite understandable. *See, When Every Sentence is a Possible Death Sentence: Public Defenders Speak From the Front Lines About Covid-19, The Justice Collaborative Institute*, April 17, 2020 (finding that 85% of public defenders surveyed believed their work put them or their families at risk); See also, *Justice, Masked Or Unmasked: COVID-19 Risks Bring A New Argument To Houston's Courtrooms*  (quoting CJA panel representative and head of the Harris County Criminal Lawyers Association: "There is no court appearance that I'm willing to die for … "I don't think there's any lawyer that is willing to die for a court appearance; they're just not willing to say it.");

Given the ongoing pandemic, "it is neither responsible from a public health standpoint nor socially tolerable for a defense investigator to meet in-person with witnesses at this time. In-person outreach by an investigator is likely to be met with fear and anxiety by the witness, with good reason." ACLU Declaration, at 4. Much of this detailed and time-intensive investigative and presentation defense work cannot be done remotely and cannot be achieved during time of social distancing. Id at 9. *See also, Vartkessian Declaration* at 13 ("Interviews of clients, witnesses, and victims must be conducted in person, face-to-face. Telephone or video interviews are not acceptable."). Simply put, telephone calls do not provide the information the investigator needs to assess demeanor, credibility, context, and myriad other details that contribute to assessment of a potential witness.

Furthermore, of great relevance here, "[w]ithout in-person client contact, defense teams lack critical information to understanding the client's current functioning." Id., at p. 6-7. An accurate "understanding of the client's current functioning" and "important nonverbal cues and evidence" are the essence of any constitutionally adequate mitigation investigation, and simply cannot occur under present conditions. Id. Certainly, "[p]hone calls or video calls are an insufficient substitute. They do not guarantee privacy or safety to the witness, they lack the necessary trust for such a call, and they deprive the interviewer of important nonverbal cues and

evidence." Id., at 10. Courts have consistently found that counsel's mitigation investigation is deficient, and ineffective, where conducted through telephone calls rather than in-person contact. *See e.g. Doe v. Ayers*, 782 F.3d 425 (9th Cir. 2015); *Thomas v. Kelley*, 2017 WL 1239148 (W.D. Ark., March 31, 2017); *Walker v. State*, 88 So. 3d 128 (Fla. 2012); *Doss v. State*, 19 So. 3d 690 (Miss. 2009); *Harries v. Bell*, 417 F.3d 631 (6th Cir. 2005); *Yarbrough v. State*, 871 So. 2d 1026 (Fla. Dist. Ct. App. 2004).

Healy is detained at the Bergen County Jail. Since March 2020 there have been months-long stretches in which he was unable to meet with his defense attorneys, mitigation specialist, and investigator. When in-person meetings between Healy and his defense team were possible they were limited to no more than 2 hours and all participants had to wear face masks. The limited duration of legal visits, coupled with the mask requirement prevents the defense team from building the kind of attorney client relationship required with any criminal defendant, let alone one facing the death penalty.

In summary, government action in mishandling the coronavirus pandemic coupled with the continued capital prosecution of Healy will deprive him of his Fifth Amendment right to due process, his Sixth Amendment right to effective assistance of counsel and his Eight Amendment right not to be subjected to cruel and unusual punishment.

## <u>Conclusion</u>

The Court should permanently bar the government from seeking the death penalty for Healy for the murders alleged in the superseding indictment since government action in its handling of the coronavirus pandemic has permanently deprived Healy's of his rights under the Fifth, Sixth and Eighth Amendments.

Respectfully submitted,

*s/Thomas Ambrosio*
*s/Stephen Turano*

Thomas Ambrosio, Esq.
Stephen Turano, Esq.

12