UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

United States of America,

v.

Michael Healy,

Defendant.

Criminal No. 18-703(MEF)

**SEALED**

**OPINION and ORDER**

The United States Marshals Service has requested that the Defendant, Michael Healy, be shackled during (a) trial and (b) jury selection.

In this District, this is a very rare request. That is as it should be. The law requires that exceedingly high standards be met before a defendant is shackled during trial.

The Court has found that those standards are met. Therefore, the Court has granted the Marshals Service's request, and has ordered that the Defendant be shackled.

The reasons for this were sketched out orally in court on February 27.

The security concerns in play in this case were also discussed orally in court on January 24; the concerns expressed then also undergird the Court's shackling decision.

This short Opinion and Order, issued during jury selection, does not summarize each of the previously-given bases for the Court's shackling decision. That is not necessary.

Rather, the Court writes briefly to provide a structured sense of its thinking and, in some places, to unpack a bit more the explanations that were orally provided in January and February.

\*   \*   \*

1

The Supreme Court has held that "[t]rial courts may not shackle defendants routinely." Deck v. Missouri, 544 U.S. 622, 627 (2005). A defendant may be shackled only if the "perils of shackling are unavoidable." Id. at 632.

"[U]navoidable" means unavoidable. Shackling must be necessary. There must be no realistic alternative.

Necessary to what? Shackling must be necessary to an "essential state interest[]." Sides v. Cherry, 609 F.3d 576, 580 (3d Cir. 2010). Here, the "essential state interest" is securing the physical safety of everyone in the courtroom as this trial unfolds, including witnesses, jurors, lawyers, and court personnel.

This is, as noted, a high standard. It cannot be met in a generic or across-the-board way --- based, for example, on a presumption that all defendants accused of certain categories of crimes be shackled.

Rather, the Court must zero in on factual information that is "specific to [the] trial." Id. (cleaned up).

Having focused solely on case-specific and defendant-specific information, the Court must then make particularized factual findings to support shackling. See Deck, 544 U.S. at 628-29.

All of this is well established.

One piece, though, is not. Namely: it is not clear if the Court's factual findings in this area must be made to a preponderance of the evidence standard, or to the higher clear and convincing evidence standard.

Given this uncertainty, the Court made its factual findings to the higher standard, of clear and convincing evidence.

\* \* \*

The Court has before it extensive information about the Defendant and his activities.

First, there are the various indictments returned by the Grand Jury.

Second, the record that has been developed in this case is large. The docket is replete with, among other things, guilty plea materials and sentencing materials. Together these provide

2

information that is extensive and finely detailed. The Court has reviewed them.

The referenced information has not been offered into evidence at a trial. And it has neither been subject to cross-examination by the Defendant's lawyers nor contextualized by any evidence the Defendant might opt to offer.

But much of this information is especially reliable.

Plea allocutions, for example, are sworn statements by a defendant as to his own conduct, made with assistance of counsel and under penalty of perjury --- and in an unmistakably consequential context. Admissions made during plea allocutions are typically precise. They are anything but casual.

In preparation for this trial, the Court has closely reviewed the abundant information on the full docket here.

The Court's conclusion: the record developed to this point overwhelmingly substantiates the accusations of murder and narcotics-trafficking described in the Grand Jury's indictment.

Take one example, of the many that might be offered.

The indictment alleges that the Defendant and another person ("Person-1"[1]) worked together to arrange for local gang members to murder a person ("Murder Victim-1") who was a narcotics-trafficker working under the Defendant and who was (correctly) believed to be cooperating with law-enforcement. See Second Superseding Indictment ¶¶ 6.f, 8. The killers who were dispatched accidentally killed the wrong person, called here Murder Victim-2. See id. at ¶ 6.f. The Defendant and Person-1 then worked to "finish the job" --- by dispatching gang members a few weeks later to kill Murder Victim-1. Murder Victim-1 was killed. Id. at ¶ 10.

In addition, per the Indictment, the Defendant and Person-1 worked together, themselves, to murder another person ("Murder

---

[1] Person-1 is *not* a cooperating witnesses. He has not provided assistance or help to the United States. He will not be testifying at the upcoming trial or any other trial or proceeding. His sentencing has been scheduled and is coming up soon. Per his plea agreement, Person-1 faces a sentence of more than 30 years in prison.

3

Victim-3") who was thought to be cooperating with law-enforcement. Murder Victim-3 was killed. See id.

Did all of this happen? There is overwhelming evidence that it did. Among other evidence, Person-1 admitted to his own role in the above-described events in his plea allocution.

A third source of information before the Court: the United States has proffered a good deal of what the trial evidence in this case will show.

For example, the United States has described in some detail the expected testimony of four trial witnesses, see The United States' February 12 Letter (Docket Entry 244), as well as some of the expected corroboration of that testimony. See February 27 Hearing Transcript.

The proffered evidence, the Court has held, in the context of an evidentiary ruling, establishes the direct and active role the Defendant played in procuring the murder of Murder Victim-1, who was providing information to law-enforcement. The proffered evidence makes it clear that the Defendant exercised tight power over local gangs. At his direction, they murdered someone the Defendant thought was a cooperating witness (Murder Victim-2) and, when they killed the wrong person, and murdered some weeks later the actual cooperating witness (Murder Victim-1).

What emerges from all this is the Defendant's demonstrated willingness to use murder to disrupt the truth-seeking process, and the devotion to him of violent local gangs, who are willing to act, repeatedly, to murder at his behest.

Examples could be multiplied. For instance, there is sufficient evidence the Defendant ordered a seemingly violent reprimand of gang members, see The United States' February 26 Letter (Docket Entry 265); Brief in Support of Defendant Michael Healy's Motion in Limine at 7 --- which underscores the control he exerts over local gangs.

There is no need to go further. The information before the Court on the full record of this case supports to the standard of clear and convincing evidence the following factual findings:

The Defendant was for many years the top leader of a large and sophisticated narcotics-trafficking organization that moved large quantities of drugs across the United States to New Jersey. The organization made routine use of firearms and

4

violence. And it acted when necessary through "sets" of local gangs that are themselves violent, relentless, and sophisticated. At the Defendant's direction, the gangs were dispatched to murder a witness the Defendant believed was cooperating with law-enforcement. The gangs did so, and killed two people in the process. And the Defendant himself participated in a murder of a person he believed was cooperating with law-enforcement.

In short: the Court finds that the Defendant has made repeated and calculated use of murder, with the intent to directly undermine the truth-seeking process --- in particular, by preventing cooperating or thought-to-be-cooperating witnesses from providing information and, eventually, from testifying at a trial such as this one.[2]

\*   \*   \*

The threat all of this poses to this soon-to-start trial is acute. And it is amplified in various ways.

First, the United States has made it clear that numerous cooperating witnesses will be testifying at the trial. Such witnesses have been targeted repeatedly by people working at the direction of the Defendant.

Second, a trial can be a nothing-to-lose moment --- and all the more so here, where the Defendant, the top leader of a sophisticated and dangerous gang, is facing a mandatory sentence of life imprisonment if convicted on certain counts. See Brief of the United States of America in Support of the Government's Pretrial Motions at 10.

Third, the gangs that have acted at the direction of the Defendant engage in violence in the immediate local area. They are based in an area that is close-in, around 3.5 or 4.5 miles from the courthouse. See, e.g., Second Superseding Indictment ¶ 3. Some of the key locations in this case, including where a murder took place, are a short (often less than 15 minute) drive from the courthouse. See, e.g., id. at ¶ 6.b. One of the key

---

[2] Indeed, in some ways, the Defendant has already disrupted through violence the trial that is soon to begin. One of the witnesses will not be able to testify because, the Court has found, the Defendant had him killed.

5

"stash house" locations is a quick walk from the courthouse. See id.

Fourth, the United States has proffered (orally, on January 24) that some of the gangs that were enlisted by the Defendant to undertake murder are "still active in these communities." January 24 Hearing Transcript. The Court credits this conclusion. And there is no reason to think the Defendant's long-standing control and influence over the actions of criminal confederates has been definitively ended by his pre-trial incarceration. Indeed, the record here establishes that the Defendant became a gang leader while serving a previous prison sentence on other charges.

\* \* \*

With all this in the background, the Court has met in person, on multiple occasions, with senior members of the United States Marshals Service. The Court has had these meetings recently to ensure up-to-date perspectives. The purpose of the meetings was for the Marshals Service to explain the basis of its shackling request. The information and assessment the Marshals Service provided was detailed, plainly expert, and up to date. The senior officials the Court met with were credible and careful. Their professional opinion was tailored to this case, and it is that the Defendant needs to be shackled in order to protect the physical safety of the people in the courtroom during jury selection and trial.

\* \* \*

Given all of the information that it has in front of it, including the information sketched out here, the Court finds as a factual matter, and to a clear and convincing standard, that shackling the Defendant is necessary to protect the physical safety of people in the well of the courtroom during both jury selection and during trial. There is, the Court finds, simply no alternative.

The specific dangers that, the Court finds, are greatly reduced by shackling the Defendant do not need to be further elaborated upon. But is suffices to note that they are the types of dangers that have been cited by other courts when, based on case-specific information, those courts have opted to shackle a defendant. These include, among others, the dangers of third parties acting at the direction of the Defendant to mount escape

6

efforts or to otherwise seek to disrupt the proceedings through violence in the courtroom, directed at witnesses or otherwise. See United States v. Baker, 432 F.3d 1189, 1244 (11th Cir. 2005) abrogated on other grounds by Davis v. Washington, 547 U.S. 813, 821 (2006); People v. Boose, 362 N.E.2d 303, 305-06 (Ill. 1977), cited approvingly in United States v. Brantley, 342 F. Appx. 762, 768 n.6. (3d Cir. 2009). Shackling, among other things, strongly disincentivizes any such possible third-party action by making it clear, upfront, that violence will not work.

* * *

The United States Marshals Service's shackling request, as noted, has been granted.

This said, the Court will take a series of steps to minimize the "inherent[] prejudice[e]" to the Defendant from shackling. Deck, 544 U.S. at 635 (cleaned up).

First, the Defendant's hands will not be shackled. Only his legs. This will provide necessary safety for those in the well of the courtroom. (The Marshals Service has not sought shackling of the Defendant's hands.) And it will allow the Defendant to comfortably assist his attorneys and to participate actively in his own defense.

Second, the Defendant will be seated next to his attorneys at counsel table. He will not be seated away from them. This will also allow the Defendant to comfortably assist his attorneys and to participate actively in his own defense.

Third, the Defendant's leg shackles will not be visible to the jury. How to accomplish this? The Defendant will sit behind a table that is equipped with curtains that reach the ground. The curtains will entirely block the Defendant's legs and feet from view of the jury. The undersigned has sat in each seat in the jury box and traced the route the jurors and potential jurors will take at various moments. Based on this, the Court can confirm that there is simply no way for a juror or potential juror to see the Defendant's shackled legs behind the table curtain, from any spot.

Fourth, spectators in the courtroom will themselves not be able to see the shackles. The undersigned has walked around the back of the courtroom and, even in an empty courtroom, does not believe there is any realistic way for spectators to see the shackles. Moreover, any possible view of the Defendant's legs

7

would, in any event, be blocked because of where Marshals Service personnel sit. And two specifically-chosen rows of the courtroom have been marked as reserved, to further ensure that there are simply no relevant sight-lines for spectators. (And: the jury will be told in emphatic terms and repeatedly that they may not discuss this case with anyone, including courtroom spectators.)

<u>Fifth</u>, the Court was informed that the shackles have been specially taped, to muffle any sounds. This has been tested and re-tested by the Defendant before the undersigned. The Court is satisfied that the shackles as currently arranged cannot be heard just as they cannot be seen.

<u>Sixth</u>, the Defendant has not yet indicated whether he will testify. If the Defendant does intend to testify, the Court will closely confer with the parties and the United States Marshals Service to determine how to allow him to do so without the jury having any sense that his legs are shackled. (Curtains will be added before trial to the witness box, so that witnesses' feet will not be visible at trial. This will increase the range of options should the Defendant opt to testify.)

<u>Seventh</u>, the Defendant's shackles --- not visible and not audible --- will not interfere with his ability to present himself to the jury in an appropriate manner. The Defendant will be able to wear courtroom clothing. And the Defendant will be able to rise when called to do so along with all other people in the courtroom. It is clear to the undersigned, from a demonstration done by the Defendant, that there is no way to hear or see the Defendant's shackles as he stands and sits.

<u>Eighth</u>, pain can become distracting, and a distracted defendant sometimes cannot participate as effectively in his own defense. There is no reason to believe the leg shackles here are painful. The Court asked the Defendant about this before any potential jurors entered the courtroom and he confirmed the shackles are not painful.

* * *

The Court has found that shackling is necessary from a safety perspective, and has granted the United States Marshals Service's shackling request. The Court is confident that the steps set out above will ensure that shackling does not unduly

prejudice the Defendant or interfere with his right to a fair trial.

This said, the Court will be alert to any possible issues that may emerge. And by this Opinion and Order the attorneys for the parties are hereby directed to immediately and discretely bring to the Court's attention any changed factual circumstances, including any information that suggests the Defendant's shackles are being seen or heard.[3]

IT IS on this 4th day of March, 2024, so **ORDERED**.

Michael E. Farbiarz, U.S.D.J.

---

[3] This Opinion and Order is issued under seal, to ensure it may be reviewed with any eye to any security or other issues that it might create. On or before a timeline to be discussed in court, the parties shall indicate in writing whether this Opinion and Order should be sealed, and, if so, what the legal basis for such sealing is. The parties are free to propose that parts of this Opinion and Order should be sealed and other parts should be unsealed. In coming to its position, the United States shall consult with all relevant third parties, including the United States Marshals Service and, through counsel, with potentially relevant co-conspirators.

9